UNPUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

v.                                              No. 00-4321

BRENDA JOYCE HAMER,
            *Defendant-Appellant.*

Appeal from the United States District Court
for the District of South Carolina, at Florence.
Cameron McGowan Currie, District Judge.
(CR-99-423)

Argued: May 10, 2001

Decided: June 1, 2001

Before WILLIAMS and KING, Circuit Judges, and
HAMILTON, Senior Circuit Judge.

_____

Affirmed in part, reversed in part, and remanded by unpublished per curiam opinion.

_____

## COUNSEL

**ARGUED:** Parks Nolan Small, Federal Public Defender, Columbia, South Carolina, for Appellant. Meghan Suzanne Skelton, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Paula M. Junghans, Acting Assistant Attorney General, Robert E. Lindsay, Alan Hechtkopf, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

## OPINION

PER CURIAM:

Brenda Joyce Hamer was convicted after a jury trial on six counts of bank fraud, in violation of 18 U.S.C.A. § 1014 (West 2000); one count of using an unauthorized access device to obtain money, goods, and services, in violation of 18 U.S.C.A. § 1029(a)(2) (West 2000); three counts of mail fraud, in violation of 18 U.S.C.A. § 1341 (West 2000); two counts of money laundering, in violation of 18 U.S.C.A. § 1956(a)(1)(A)(i) and (a)(1)(B)(i) (West 2000), and three counts of willfully subscribing to false tax returns, in violation of 26 U.S.C.A. § 7206 (West 1999 & Supp. 2000). On appeal, Hamer challenges her convictions for bank fraud; using an unauthorized access device to obtain money, goods, and services; and money laundering.[1] For the reasons that follow, we reverse Hamer's conviction on one of the money laundering counts and remand for the district court to strike the assessment applicable to that count but affirm Hamer's other convictions and sentence.

### I.

In 1995, Hamer, an attorney, represented Rosslee Douglas in a civil lawsuit. Between December 1995 and March 1996, Hamer, using Douglas's name, social security number, and birth date, but Hamer's own address, applied for and received eight credit cards. Hamer also established a second telephone line at her residence in Dillon, South Carolina under Douglas's name.

Hamer purchased merchandise with the credit cards and also used the credit cards to conduct several wire transfers through Western Union. Hamer completed the wire transfers by telephoning Western

---

[1]Hamer's counsel explicitly waived all challenges related to Hamer's convictions for mail fraud and wilfully subscribing to false tax returns.

Union from her home, using the telephone line that Hamer established in Douglas's name and identifying herself as Douglas.[2] Hamer structured the Western Union transfers so that the money would be wired to various locations in other states. On one instance, Hamer drove to another state to receive the wire transfer. In other instances, Hamer directed her friends and relatives to retrieve the money for her.

Hamer also fraudulently obtained two mortgages on her home using Douglas's information. In addition, to obtain extra cash, Hamer refinanced her mortgage with Orlando Brockington, Hamer's co-defendant and the owner of a mortgage broker business. Brockington agreed to create a fictitious debt in the amount of $10,677, which he claimed Hamer owed to his company. Brockington then submitted the debt to another mortgage company on behalf of Hamer as a request for an additional loan, which the mortgage company granted and paid to Brockington's company. Brockington turned these proceeds over to Hamer and kept a fee of $1,100.

Douglas discovered Hamer's fraudulent use of her name on April 6, 1996, when Hamer was attempting another wire transfer. Douglas received a telephone call from a Western Union transaction validator, who asked whether she was attempting to telegraph money and if she was aware of the existence of a telephone account in her name in Dillon, South Carolina. Douglas told the validator that she was not attempting to wire money and had not authorized any telephone service in Dillon. The validator asked her to stay on the line for a three-way call to Dillon to see whether Douglas could identify the voice. When the validator telephoned the number in Dillon and asked for Rosslee Douglas, Hamer answered, "This is she." (J.A. at 228.) The validator asked for Hamer's birth date and social security number. Hamer replied with Douglas's information. Douglas identified the voice as Hamer's.

Hamer later told a Secret Service Agent that she had applied for and used the credit cards in Douglas's name pursuant to a "gentlela-

---

[2]When an individual orders a wire transfer over the telephone, Western Union requires that the call be placed only from the individual's residence or workplace, as a means of verifying that the person sending the money is the person who is authorized to use the credit card.

dy's agreement" between herself and Douglas and that Douglas had terminated the agreement after the failed Western Union transfer. (J.A. at 153, 167.) Hamer explained that she was unable to obtain credit on her own; therefore, Douglas had authorized Hamer to use Douglas's identity to obtain and use credit for Hamer's sole benefit. According to Hamer, the agreement arose out of her legal representation of Douglas in a civil lawsuit in which Hamer had not been awarded attorney's fees. Douglas, on the other hand, testified that she never authorized Hamer to apply for credit cards in Douglas's name and that she was unaware of any legal fees or costs that were outstanding from Hamer's prior legal representation.

## II.

On July 27, 1999, a grand jury in the District of South Carolina indicted Hamer on fifteen counts related to Hamer's fraudulent use of Douglas's name. Hamer was charged with six counts of bank fraud, in violation of 18 U.S.C.A. § 1014 (West 2000) (Counts 1-6); one count of using an unauthorized access device to obtain money, goods, and services, in violation of 18 U.S.C.A. § 1029(a)(2) (West 2000) (Count 7); three counts of mail fraud, in violation of 18 U.S.C.A. § 1341 (West 2000) (Counts 8, 10, 11); and three counts of willfully subscribing to false tax returns, in violation of 26 U.S.C.A. § 7206 (West 1999 & Supp. 2000) (Counts 13, 14, 15). Count 9 of the indictment alleged money laundering, in violation of 18 U.S.C.A. § 1956(a)(1)(A)(i) and (a)(1)(B)(i) (West 2000). The Government intended to charge a second count of money laundering in Count 12, but instead, Count 12 in the indictment returned by the grand jury repeated the mail fraud allegations found in Count 11.[3]

Hamer represented herself during the jury trial, which began on September 7, 1999. On September 24, 1999, the jury found Hamer guilty on all counts. The district court sentenced Hamer to serve 108 months of imprisonment, consisting of 108 months as to each of

---

[3]During Hamer's jury trial, the court and the jury used a "conformed copy" of the indictment that contained the correct version of Count 12. This copy, however, was not signed by the grand jury foreperson and is not the same as the original indictment that was signed by the grand jury foreperson.

Counts 1, 2, 3, 4, 5, 6, 7, 9, and 12; 60 months as to each of Counts 8, 10, and 11; and 36 months as to each of Counts 13, 14, and 15, all to be served concurrently. Hamer also was ordered to pay restitution in the amount of $42,334.25. Additionally, a three year term of supervised release was imposed, consisting of three years as to Counts 1 through 12 and one year as to Counts 13 through 15, to run concurrently.

Hamer appeals her convictions with respect to Counts 1 through 6, 9, and 12. Hamer alleges that the indictment was fatally defective as to Count 9 because it failed to allege properly the essential elements of the offense of money laundering; that there was insufficient evidence to charge the jury as to Count 9; that the district court erred by submitting Count 12 to the jury because Count 12 was omitted from the indictment that was returned by the grand jury; and that the district court erred by giving an erroneous supplemental jury instruction in connection with Counts 1 through 6. We address each argument in turn.

## III.

Hamer first raises three challenges with respect to her conviction under Count 9. Because she failed to raise these challenges before the district court, we review each for plain error. To establish plain error, Hamer must demonstrate: (1) the existence of an error; (2) that the error was "plain"; (3) that the error affected Hamer's substantial rights; and (4) that the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *United States v. Olano*, 507 U.S. 725, 732 (1993).

## A.

Hamer first argues that her conviction under Count 9 should be reversed under plain error because Count 9 failed to allege a nexus with interstate commerce. Count 9 charges Hamer with money laundering, in violation of 18 U.S.C.A. § 1956(a)(1)(A)(i) and (a)(1)(B)(i) (West 2000).[4] Hamer is correct to contend that a "de minimis" effect

---

[4]To support a conviction for money laundering, the indictment must allege, and the government must prove, that the defendant conducted a

on interstate commerce is an essential element of money laundering. *See United States v. Wilkinson*, 137 F.3d 214, 221 (4th Cir. 1998). The Government argues that the indictment sufficiently alleged a "de minimis" effect on interstate commerce because it alleged that Hamer participated in a "financial transaction" involving the proceeds of unlawful activity. (J.A. at 64.) The Government argues that the use of the term "financial transaction," along with the citation to the money laundering statute, adequately charged the appropriate nexus with interstate commerce because "financial transaction" is statutorily defined as involving a nexus with interstate commerce. The statute defines "financial transaction" as: "(A) a transaction which in any way or degree affects interstate or foreign commerce . . . or (B) a transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce in any way or degree." 18 U.S.C.A. § 1956(c)(4).

We previously have rejected the Government's precise argument when the challenge to the indictment was raised properly before the district court. *United States v. Hooker*, 841 F.2d 1225, 1232 (4th Cir.) (en banc), *cert. denied*, 488 U.S. 842 (1988); *United States v. Pupo*, 841 F.2d 1235, 1239 (4th Cir. 1988) (en banc). Nevertheless, the stan-

---

financial transaction with proceeds from a specified unlawful activity. 18 U.S.C.A. § 1956(a)(1). The text of the statute provides:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity —
>
> (A)(i) with the intent to promote the carrying on of specified unlawful activity; or . . .
>
> (B) knowing that the transaction is designed in whole or in part —
>
> (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; . . .
>
> shall be sentenced to a fine . . . or imprisonment . . . or both.

18 U.S.C.A. § 1956(a)(1) (West 2000).

dards to which we hold indictments when they are timely challenged yield to other considerations when the challenge is raised for the first time on appeal. When a challenge to an indictment is raised for the first time on appeal, the government has lost its usual remedy for a defect, "obtain[ing] a superseding indictment with little or no delay in the scheduled trial," *Hooker*, 841 F.2d at 1232, and an entire trial must be repeated if a conviction is to be again sought. This countervailing consideration led to our rule that, when reviewing an indictment for plain error, "[i]ndictments and informations are construed more liberally [than when they were objected to before the district court] . . . and every intendment is then indulged in support of the sufficiency." *United States v. Sutton*, 961 F.2d 476, 479 (4th Cir. 1992) (internal quotation marks omitted); *see also Hooker*, 841 F.2d at 1229 & n.2 (making clear in dicta that a different rule applies to post-verdict challenges to an indictment); *Pupo*, 841 F.2d at 1239 (same).

To effectuate this liberal standard of construing the indictment, when a defendant has failed to object to the indictment before the district court, we will not reverse a conviction for a defect in the indictment unless: (1) the defect prejudiced the defendant; or (2) the defect is so serious that the indictment cannot reasonably be construed to charge a crime. *See Hagner v. United States*, 285 U.S. 427, 430-33 (1932); *United States v. Short*, 181 F.3d 620, 627 (5th Cir. 1999); *United States v. Wydermyer*, 51 F.3d 319, 324 (2d Cir. 1995); *United States v. Vanover*, 888 F.2d 1117, 1120 (6th Cir. 1989); *Finn v. United States*, 256 F.2d 304, 307 (4th Cir. 1958).

Applying this test, we first conclude that Hamer suffered no prejudice from the indictment's failure expressly to recite the interstate commerce nexus requirement. Hamer knew in advance of trial the full nature of the allegations against her because the parties engaged in open discovery. Additionally, the proof introduced at trial demonstrated multiple transactions involving federally insured financial institutions and wire transfers involving multiple states. In the offense conduct involving Count 9, the evidence demonstrated that Hamer placed a telephone call from South Carolina to Fayetteville, North Carolina to transfer money, and she then drove across state lines to pick up the money. Accordingly, there is no question that the interstate commerce nexus requirement was proven sufficiently at trial and

that Hamer was not prejudiced by the failure to charge with precision the element in the indictment.[5]

Thus, we must next address whether the indictment reasonably can be construed to charge a crime. To charge a crime, an indictment must "contain the elements of the offense charged, fairly inform a defendant of the charge against which he must defend, and, . . . enable him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Wicks*, 187 F.3d 426, 427 (4th Cir. 1999) (internal quotation marks omitted); *see Russell v. United States*, 369 U.S. 749, 763-64 (1962). The use of the phrase "financial transaction" and the citation to the statute were sufficient to establish these requisites under the liberal standard by which we must review this indictment. Thus, construing the indictment with "every intendment . . . indulged in support of the sufficiency," *Sutton*, 961 F.2d at 479 (internal quotation marks omitted), we hold that the indictment properly charged the element of effect on interstate commerce for purposes of plain error review.[6] *Cf. United States v. Vogt*, 910 F.2d

---

[5]During oral argument, Hamer also challenged the sufficiency of the jury instruction as to the interstate commerce nexus in Count 9. Hamer did not preserve this issue for our review by including it in her opening brief; thus the challenge to this jury instruction has been waived. *See Cavallo v. Star Enter.*, 100 F.3d 1150, 1152 n.2 (4th Cir. 1996) (holding that an issue first argued in a reply brief is not properly before a court of appeals). Moreover, because the evidence clearly demonstrated the requisite nexus with interstate commerce, Hamer cannot establish plain error with respect to the jury instruction.

[6]Hamer also argues that Count 9 failed to allege an essential element of the offense because it failed to use the precise statutory language contained in 18 U.S.C.A. § 1956(a)(1). Count 9 alleges that Hamer conducted financial transactions involving the proceeds of *unlawful activity*, whereas 18 U.S.C. § 1956(a)(1) prohibits *specified unlawful activity*. Specifically, Count 9 states, "Hamer . . . did conduct . . . a financial transaction which in fact *involved the proceeds of unlawful activity, that is, false statements to insured financial institutions and credit card fraud*. . . ." (J.A. at 75 (emphasis added).) Hamer argues that the failure to include the word "specified" in Count 9 is reversible error. Even assuming that the failure to use the exact statutory language was error, it certainly was not plain error because it did not prejudice Hamer or affect her substantial rights, in that the indictment set forth the specified unlawful

1184, 1201 (4th Cir. 1990) (noting that when a post-verdict challenge to the sufficiency of an indictment is made, the issue is "whether the necessary facts appear in any form, or by a fair construction can be found within [its] terms.") (internal quotation marks omitted).

## B.

Hamer next challenges her conviction under Count 9 on the basis that the indictment fails to allege sufficient facts because it does not identify or specify the property involved in the financial transaction and does not identify the specified unlawful activity. Federal Rule of Criminal Procedure 7(c)(1) requires an indictment to include the "essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). Under plain error review, however, any error in the factual allegations contained in the indictment did not prejudice Hamer because the parties had the benefit of open discovery. Moreover, Hamer informed the district court in a pre-trial status conference that she fully understood the charges in the indictment. Thus, assuming without deciding that the indictment fails to allege sufficient facts, Hamer cannot establish that she is entitled to have this error corrected on appeal.

## C.

Finally, Hamer contends that her conviction under Count 9 should be reversed because the evidence introduced at trial was insufficient as a matter of law to establish the essential elements of the offense. Specifically, Hamer alleges that the Government failed to introduce evidence establishing the concealment prong of the money laundering

---

activity at issue — false statements to financial institutions and credit card fraud. *See United States v. Williams*, 152 F.3d 294, 299 (4th Cir. 1998) ("The mere failure to track the precise language of a statute does not without more, constitute error."); *United States v. Sutton*, 961 F.2d 476, 479 (4th Cir. 1992) (finding that failure to allege "scienter" in indictment is not fatal where defendant was not prejudiced in any manner); *United States v. Vogt*, 910 F.2d 1184, 1201 (4th Cir. 1990) (upholding sufficiency of indictment despite lack of specific mention of the "defraud" element in the underlying charge).

statute. "When reviewing the evidence that resulted in a conviction, we take the evidence in the light most favorable to the government to determine whether the jury's verdict was supported by substantial evidence." *United States v. Strickland*, 245 F.3d 368, 385 (4th Cir. 2001).

To be sustained, a money laundering conviction based upon concealment requires proof that the defendant knew that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or control of the proceeds of the unlawful activity. *Wilkinson*, 137 F.3d at 221. To establish this element, the Government must prove a specific intent to conceal. *See United States v. Gilliam*, 975 F.2d 1050, 1056 (4th Cir. 1992).

In *United States v. Villarini*, 238 F.3d 530 (4th Cir. 2001), we held that transactions that are designed to avoid suspicion or to give the appearance of a "legitimate cash income stream" adequately support a finding that the defendant possessed the requisite specific intent to conceal and thereby sustain a money laundering conviction. *See id.* at 532. Here, the evidence involving Count 9 demonstrated that Hamer fraudulently obtained credit and then used it to obtain a money transfer through Western Union. Instead of appearing at the bank that issued the card or visiting Western Union in person to receive a cash advance on the fraudulently obtained credit card, Hamer used the phone line that she had established in Douglas's name in South Carolina to call Western Union and request a money transfer to Hamer based upon the credit card in Douglas's name, to be delivered in North Carolina. Structuring the transaction in this way helped Hamer avoid suspicion because it allowed her to act as if she were both Douglas and Hamer, which she could not have done if she had visited the bank or Western Union in person. Additionally, the Western Union scheme was part of a larger scheme of using Western Union to convert fraudulently obtained credit into the appearance of "a legitimate cash income stream." *Villarini*, 238 F.3d at 532. Thus, under *Villarini*, the evidence was sufficient to support the concealment prong of money laundering because the evidence demonstrates that Hamer structured the Western Union transaction to avoid suspicion and to create an impression of a legitimate cash income stream. Accordingly, we hold that the evidence is sufficient to support a finding that Hamer conducted the financial transaction through Western

Union with the specific intent to conceal the source of the proceeds of her unlawful activity — fraudulently obtaining a credit card in Douglas's name.

Hamer relies upon *United States v. Olaniyi-Oke*, 199 F.3d 767 (5th Cir. 1999), to support her argument that the evidence was insufficient as a matter of law to establish concealment. In *Olaniyi-Oke*, the defendant used a fraudulently obtained credit card to make a direct purchase of computers. *See id.* at 771. The Fifth Circuit held that such a transaction did not constitute money laundering because the transaction was not distinct from the underlying unlawful activity and did not create an impression of legitimate wealth. As the Fifth Circuit noted, the money laundering statute is intended to punish "conduct that is really distinct from the underlying specified unlawful activity."[7] *Id.* at 771 (internal quotation marks omitted).

As outlined above, however, Hamer's structuring of the financial transaction involving Western Union was distinct from the specified unlawful activity of fraudulently obtaining a credit card in another person's name. Her use of the telephone line that she established in Dillon for the purpose of transferring money through Western Union was intended to avoid suspicion that would have arisen had Hamer attempted to obtain a cash advance in person on the credit card at the issuing bank or at Western Union. Additionally, contrary to *Olaniyi-Oke*, Hamer did not use the credit card to make a direct purchase; instead, Hamer converted the fraudulently obtained credit into cash,

---

[7]Hamer also argues that *United States v. Olaniyi-Oke*, 199 F.3d 767 (5th Cir. 1999), stands for the proposition that purely personal use of illegally obtained funds cannot support a money laundering conviction. We note that this is an incorrect statement of the law set forth in *Olaniyi-Oke*. Rather, the Fifth Circuit held that, "[i]f transactions are engaged in for *present* personal benefit, *and not to create the appearance of legitimate wealth*, they do not violate the [concealment prong of the] money laundering statute." *Id.* at 771 (emphasis added). Here, the Western Union wire transfer was not solely for present personal benefit; rather, it created a stream of cash that could be used subsequently for any purpose. *See, e.g.*, *United States v. Villarini*, 238 F.3d 530, 532 (4th Cir. 2001) (upholding money laundering conviction under the concealment prong when embezzled funds were placed in bank accounts and later were spent on purely personal uses of living and moving expenses).

creating a stream of cash that appeared to be legitimate wealth. Therefore, we conclude that Hamer's use of Western Union as part of a larger scheme to transfer cash to herself was distinct from the specified unlawful activity of fraudulently obtaining the credit card. Accordingly, we decline to reverse Hamer's conviction on Count 9.

IV.

Hamer next contends that her conviction and sentence for money laundering under Count 12 should be set aside because, in the indictment that was returned by the grand jury, Count 12 did not charge Hamer with money laundering. Instead, Count 12, as it appeared in the indictment that was returned by the grand jury, repeated the mail fraud allegations found in Count 11. While the Government intended to include two money laundering counts in the indictment — Counts 9 and 12, the Government concedes that it accidentally omitted this second money laundering count and instead erroneously duplicated Count 11. During Hamer's jury trial, the district court and the jury used what purported to be a "conformed copy" of the indictment. In this "conformed copy," Count 12 was listed as a money laundering count. Because Hamer did not object to the use of the "conformed copy," the district court was unaware that the "conformed copy" differed from the indictment that was returned by the grand jury. Thus, the district court tried Hamer on Count 12 as a money laundering charge, submitted Count 12 to the jury as a money laundering charge, and the jury convicted Hamer of money laundering under Count 12. As Hamer did not object to the submission to the jury of Count 12, as it appeared in the "conformed copy" of the indictment, we review for plain error. *See United States v. Olano*, 507 U.S. 725, 732 (1993).

Count 12 was completely omitted from the indictment that was returned and signed by the grand jury. "The Fifth Amendment to the United States Constitution, which in relevant part provides: 'No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury' . . . guarantees that a criminal defendant will be tried only on charges in a grand jury indictment." *United States v. Randall*, 171 F.3d 195, 203 (4th Cir. 1999), *cert. denied*, *Randall v. United States*, 121 S. Ct. 248 (2000) (internal quotation marks and citations omitted). "Therefore, only the grand jury may broaden or alter the charges in the indictment." *Id.*

(citing *Stirone v. United States*, 361 U.S. 212, 215-16 (1960)). "When the government, through its presentation of evidence and/or its argument, or the district court, through its instructions to the jury, or both, broadens the bases for conviction beyond those charged in the indictment, a constructive amendment — sometimes referred to as a fatal variance — occurs." *Randall*, 171 F.3d at 203. As the Government concedes, charging the jury on a version of Count 12 that was omitted from the indictment constitutes a constructive amendment of the indictment because it allowed the jury to convict Hamer of an offense that was not included in the indictment. *See United States v. Floresca*, 38 F.3d 706, 710-12 (4th Cir. 1994) (en banc) ("[C]onvicting a defendant of an unindicted crime affects the fairness, integrity, and public reputation of federal judicial proceedings in a manner most serious."). As we held in *Floresca*, a constructive amendment of a federal indictment is error per se and "must be corrected on appeal even when not preserved by objection." *Id.* at 714; *see also Stirone*, 361 U.S. at 217 ("[A] court cannot permit a defendant to be tried on charges that are not made in the indictment against him."). Thus, as the Government readily acknowledges, Hamer's conviction for Count 12 must be reversed.

As the Government points out, however, reversal of Count 12 does not affect Hamer's sentence in any way. The district court sentenced Hamer to 108 months of imprisonment, consisting of 108 months as to each of Counts 1 through 7, 9, and 12, 60 months as to each of Counts 8, 10, and 11, and 36 months as to each of Counts 13 through 15, with concurrent terms of imprisonment for each of her fifteen counts. The base offense level for each of Hamer's money laundering counts was 23, pursuant to U.S.S.G. § 2S1.1(a)(1). *See* U.S. Sentencing Guidelines Manual § 2S1.1(a)(1) (1998). Although Counts 9 and 12 were grouped together because they involve substantially the same harm, the grouping did not result in an increase in the base offense level for money laundering. (J.A. at 470); U.S.S.G. § 3D1.2(d); U.S.S.G. § 2S1.1(a)(1). Thus, Hamer's base offense level for money laundering is 23, irrespective of Count 12. Adding the base offense levels for Hamer's other convictions to the base offense level of 23 resulted in an ultimate base offense level of 29, which establishes a guideline range of 87 to 108 months. *See* U.S.S.G. ch. 5, pt. A. Because Hamer's convictions, without regard to Count 12, are sufficient to justify the base offense level of 29, reversal of Hamer's con-

viction under Count 12 does not alter her sentence. *Cf. United States v. White*, 238 F.3d 537, 542-43 (4th Cir. 2001) (holding that an error in sentencing is not plain error when the sentences were imposed concurrently and consecutive sentencing for each count would have provided the same sentence because the erroneous sentence is not longer than that to which the defendant would otherwise have been subjected).[8] Inasmuch as Hamer's sentence is not affected by our vacating Count 12, we decline to remand for resentencing but remand for the district court to strike any assessment attributable to that count.

V.

Finally, Hamer argues that the district court gave an erroneous supplemental jury instruction in connection with Counts 1 through 6. This Court reviews supplemental jury instructions for abuse of discretion. *United States v. Smith*, 62 F.3d 641, 646 (4th Cir. 1995).

Counts 1 through 6 charge Hamer with violating 18 U.S.C.A. § 1014 (West 2000) by making false statements to an FDIC-insured bank arising from Hamer's fraudulent application for credit in Douglas's name. The elements of the offense are (1) that the defendant made a false statement to the bank; (2) that the statement was made for the purpose of influencing the bank's actions; (3) the statement was false as to a material fact; and (4) that the defendant knowingly made the false statement. *See* 18 U.S.C.A. § 1014; *United States v. Smith*, 29 F.3d at 914, 916 (4th Cir. 1994).

During deliberations, the jury asked whether

> one person can legally authorize another person to apply for and use a credit card using the first person's identity, in other words, name, social security number and date of birth. To be more specific, could Rosslee Douglas authorize Brenda J. Hamer to apply for credit cards in Douglas' name using her social security number and date of birth and authorize her to sign Rosslee Douglas' name to credit card transactions? Verbally?

---

[8]Hamer's supervised release term also is unaffected by reversal of Count 12.

(J.A. at 360.) The district court responded by stating,

> An individual cannot legally authorize another individual to apply, to fill out a credit card application using the first person's name, social security number and date of birth, and send that in to a financial institution without advising the financial institution of the true identity of the applicant.

> Therefore, if Rosslee Douglas authorized Ms. Hamer to fill out the application — if she told her to fill out the application, if you were to find this, if she told her to go ahead and fill out the application, use her name, use her date of birth and use her social security number and send it in, and the bank was not made aware of that, then Rosslee Douglas could be found guilty if she were charged with making a false statement to a federally insured financial institution.

> In other words, two people cannot get together and agree to file what is a false statement, and therefore avoid this statute. So if that is what happened, if that is what you find happened, then if you find a false statement was made, you would have to determine whether a false statement was made by Ms. Hamer. But I'm telling you that Ms. Rosslee Douglas cannot cure it by telling Ms. Hamer you fill out this application and send it in to the financial institution. The financial institution would have to be advised that the person that it is being asked to issue credit to is not the real person on the application.

(J.A. at 361-62.)

Hamer argues that this instruction was erroneous and nonresponsive. She contends that the district court should have instructed the jury that, under the principles of agency, Douglas's alleged authorization for Hamer to apply for credit in Douglas's name negates Hamer's requisite intent both as to the falsity of the statements and her intent to influence the bank.

Agency has been defined as "[a] relationship between two persons, by agreement or otherwise, where one (the agent) *may act on behalf*

*of the other* (the principal) and bind the principal by words and actions." *Black's Law Dictionary* (6th ed. 1990) (emphasis added)). Under this definition, had the evidence supported a finding that Douglas authorized Hamer to apply for credit in Douglas's name for Douglas's benefit and with the intent to bind Douglas, the authority would have negated the intent required to support a conviction under § 1014 and would have entitled Hamer to a jury instruction on agency. *See, e.g.*, *United States v. West*, 666 F.2d 16, 19 (2d Cir. 1991). The district court, however, did not abuse its discretion by refusing to give an agency instruction because the instruction as given accurately summarizes the law as it relates to the evidence introduced in this case.

The only evidence introduced regarding Hamer's authority established that Hamer was authorized to apply for credit for Hamer's benefit and not to bind Douglas. *Cf. id.* at 19 (holding that West's authority to sign his wife's name to mortgage documents would negate West's intent to defraud if he was acting on his wife's behalf with the intent to bind her to the obligations under the mortgage). The IRS agent that interviewed Hamer testified that Hamer informed him that Douglas had authorized Hamer to use Douglas's name and information because Hamer had a poor credit history and could not obtain her own credit. Hamer also informed the IRS agent that her credit had become poor because "she had been cheated out of her attorney fees that were due to her in a civil case in which she had represented" Douglas. (J.A. at 154.) This evidence does not support an inference that Hamer was acting for Douglas's benefit with the intent to bind Douglas to the obligations under the credit card applications. Instead, the only inference to be drawn from this evidence is that Hamer was acting for her own sole benefit, with no intent to bind Douglas, when applying for credit cards in Douglas's name. Accordingly, Hamer was not entitled to a jury instruction on agency. *Matthews v. United States*, 485 U.S. 58, 63 (1988) (holding that a defendant is entitled to a jury instruction only when there is a foundation in the law and in the evidence for such an instruction); *United States v. Horton*, 921 F.2d 540, 543 (4th Cir. 1990) ("No instruction may be given unless there is a foundation in the evidence to support it.") (internal quotation marks omitted). Thus, we affirm Hamer's convictions on Counts 1 through 6.

## VI.

Due to the defect in the indictment with respect to Count 12, we reverse Hamer's conviction for money laundering under that count. Because Hamer has failed to establish plain error with respect to her remaining challenges, we affirm Hamer's other convictions. Based upon our affirmance of the other counts involved in this appeal, we decline to remand for resentencing because Hamer's sentence is unaffected by our reversal of Count 12; however, we remand for the district court to strike any assessment as to Count 12.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED*