1 F.3d 1234
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Thomas BELL, Defendant-Appellant.
 No. 92-5656.
 United States Court of Appeals,
Fourth Circuit.
 Argued: May 7, 1993.
Decided: August 16, 1993.
 
 Appeal from the United States District Court for the Southern District of West Virginia, at Beckley. Elizabeth V. Hallanan, District Judge. (CR-92-15)
 Thomas W. Smith, Smith, Carnutte & Hostler, Charleston, West Virginia, for Appellant.
 Kelly D. Ambrose, Assistant United States Attorney, Charleston, West Virginia, for Appellee.
 Michael W. Carey, United States Attorney, Charleston, West Virginia, for Appellee.
 S.D.Va.
 AFFIRMED.
 Before ERVIN, Chief Judge, and PHILLIPS and MURNAGHAN, Circuit Judges.
 OPINION
 PER CURIAM:
 
 
 1
 Thomas Bell appeals his convictions on transaction structuring and money laundering charges and the sentence imposed upon them. Finding no reversible error, we affirm.
 
 
 2
 * In the course of an investigation in January 1991 of possible participation in illegal drug transactions by Houston Earehart, an employee of the West Virginia automobile dealership Howard Earehart, Inc (HEI), West Virginia and federal IRS agents were alerted to Bell's possible involvement. When undercover agents of the state police approached Earehart about the possibility of purchasing an automobile with drug proceeds, Earehart mentioned Bell, a fellow employee at HEI, as someone who "might know what to do."
 
 
 3
 When the agents actually arranged such a transaction with Earehart in February, Bell participated extensively. The agents selected a 1991 Pontiac Bonneville and, with the cooperation of Earehart and Bell, used the fictitious name "Susan Scott" as the purchaser. The purchase price was $17,905, and they gave that amount in cash to Bell, who counted it and prepared the sales worksheet for the car. When the dealership's business manager warned Bell that purchases in cash over $10,000 had to be reported to the IRS, Bell drove the agents to his personal bank to purchase a $9,000 cashier's check with part of the cash. He then took from the agents the check and $8,905 in cash, producing for the agents three receipts: one for the $9,000 cashier's check, one for $8,000 cash, and one for $905 cash. Though the agents tendered the entire $17,905 on February 8, the cashier's check was deposited February 11 and the cash February 13 or 14. The required IRS transaction report wasn't filed.
 
 
 4
 Shortly thereafter the agents arranged with Earehart a second transaction for six cars to be titled under fictitious names and to be paid for with approximately $100,000 cash that the agents represented to Earehart as drug money. Bell subsequently accompanied Earehart to a meeting with the agents where the details were to be worked out. When the two arrived, Bell took over, explaining to the undercover agents that he had designed the transaction to avoid IRS reporting requirements and telling them how to make it work. During his conversation with the agents, Bell expressed knowledge of the illegality of his acts, and the agents made clear their ostensibly drug-related source of funds. When Bell finished explaining the transaction, he left the hotel with one of the agents to purchase cashier's checks at various local banks. At that point the authorities intervened.
 
 
 5
 In January 1992 Bell was indicted by a federal grand jury in the Southern District of West Virginia on one count of structuring a transaction to evade reporting requirements (31 U.S.C.Sec. 5322, 5324; 18 U.S.C. Sec. 2) and one count of laundering monetary instruments (18 U.S.C. Secs. 2, 1956(a)(3)(C)). Following a jury trial resulting in verdicts of guilty on both counts, the court entered judgments of conviction on both verdicts and sentenced Bell to 51 months in prison and a $5,000 fine.
 
 
 6
 Bell appealed.
 
 II
 
 7
 Bell challenges the sufficiency of his indictment, the district court's jury instructions, and two aspects of the district court's handling of his sentencing. We take these in order.
 
 
 8
 * With respect to the indictment, Bell claims that Count Two, the money laundering charge, was fatally defective because the government failed to recite within it an essential element of the crime, a nexus with interstate commerce.[1] He argues that our decisions in United States v. Hooker, 841 F.2d 1225 (4th Cir. 1988) (en banc), cert. denied, 488 U.S. 842 (1988), and United States v. Pupo, 841 F.2d 1235 (4th Cir. 1988) (en banc), require such a recitation. Acknowledging that Hooker and Pupo require recitation in the indictment of an offense's essential elements, Hooker, 841 F.2d at 1232; Pupo, 841 F.2d at 1239, the government nevertheless contends that its inclusion in Count Two of Bell's attempt to conduct a "financial transaction," which tracks the statutory language of Sec. 1956(a)(3)(C), complies with that requirement, because the interstate commerce nexus requirement is contained in a statutory provision defining the term "financial transaction," 18 U.S.C. Sec. 1956(c)(4), rather than the text defining the offense itself, 18 U.S.C. Sec. 1956(a)(3)(C).
 
 
 9
 We agree with Bell that the interstate commerce nexus is an essential element of his offense, i.e. a fact the government must prove beyond a reasonable doubt in order to convict a defendant of the crime, and we have held as much before. United States v. Baker, 985 F.2d 1248, 1252 (4th Cir. 1993); United States v. Peay, 972 F.2d 71, 74 (4th Cir. 1992), cert. denied, 113 S. Ct. 1027 (1993). Contrary to the government's claim, the nexus requirement's physical location in the statute books is irrelevant. An essential element is one "whose specification ... is necessary to establish the very illegality of the behavior and thus the court's jurisdiction." Hooker, 841 F.2d at 1231 (quoting United States v. Cina, 699 F.2d 853, 859 (7th Cir. 1983), cert. denied, 464 U.S. 991 (1983)). Hooker involved an indictment's failure to allege an interstate commerce nexus, and we noted there that "[a]lthough the missing element [ ] does not describe overt illegal behavior, it is nonetheless essential in a federal indictment because it establishes the court's jurisdiction." Hooker, 841 F.2d at 1231-32. Placement in the "definitional" subsection ofSec. 1956 rather than the"offense creation" subsection lacks legal significance when the definition contains a distinct fact that must be proven beyond a reasonable doubt in order to convict a defendant of the crime charged.[2]
 
 
 10
 Under the standards articulated in Hooker and Pupo, then, a timely challenge to Bell's indictment might well have succeeded. As it happens, however, Bell's defective indictment claim is raised for the first time on this appeal, and this tardy presentation of the claim puts it in a different light. Although an indictment that fails to charge an offense can be challenged at any time during the pendency of the proceedings, Fed. R. Crim. P. 12(b)(2), the rigorous standards to which we hold indictments when they are timely challenged must yield to other imperatives when the challenge is raised for the first time on appeal. At that point the government's usual remedy for a defect, "obtain[ing] a superseding indictment with little or no delay in the scheduled trial," Hooker, 841 F.2d at 1232, has been lost, and an entire trial must be repeated if a conviction is to be again sought. This countervailing concern recently led us to reaffirm our longstanding rule that in such cases "[i]ndictments and informations are construed more liberally ... and every intendment is then indulged in support of the sufficiency." United States v. Sutton, 961 F.2d 476, 479 (4th Cir.) (quoting Finn v. United States, 256 F.2d 304, 307 (4th Cir. 1958)), cert. denied, 113 S. Ct. 171 (1992); see also Hooker, 841 F.2d at 1229 & n.2 (making clear in dicta that a different rule applies to postverdict challenges to an indictment); Pupo, 841 F.2d at 1239 (same). In such cases we will not, absent prejudice, reverse a conviction for a defect in the indictment unless the defect is so serious that the indictment cannot reasonably be construed to charge a crime. Hagner v. United States, 285 U.S. 427, 479 (1932); United States v. Vanover,888 F.2d 1117, 1120 (6th Cir. 1989), cert. denied, 495 U.S. 934 (1990).
 
 
 11
 Applying that liberal standard, we conclude, as a threshold matter, that Bell suffered no prejudice from Count Two's failure expressly to recite the interstate commerce nexus requirement. Bell's claim of prejudice centers on his contention that the government failed to adduce evidence of any interstate commerce nexus and that he lost his chance to secure an acquittal on that basis because his counsel lacked notice, which a properly drawn indictment would have provided, that such proof was required. We disagree, because the record shows that the government did in fact present sufficient evidence to establish beyond a reasonable doubt the money laundering transaction's necessary de minimis nexus with interstate commerce, see Peay, 972 F.2d at 74 (determining that Congress intended in passing 18 U.S.C. Sec. 1956 the broadest possible exercise of its constitutional commerce powers) and Bell has never-even at this late date-suggested that such a nexus is lacking. At trial, the government specifically asked Bell whether the cars involved in the money laundering transaction were manufactured in West Virginia, and he conceded that they were not.[3] Given that the transaction itself occurred in West Virginia, this testimony is more than sufficient to prove a nexus with interstate commerce.
 
 
 12
 Having found no prejudice, we now consider whether the alleged defect in the indictment is so serious that the indictment cannot reasonably be construed to charge a crime. The Fifth and Sixth Amendments require that an indictment "(1) contain the elements of the charged offense and fairly inform a defendant of the charges against him, and (2) enable him to plead double jeopardy in defense of future prosecutions for the same offense." Sutton, 961 F.2d at 479. There is no doubt that the indictment recites the facts with sufficient particularity to avoid any future double jeopardy problem, so only fair notice is contested. Under the liberal standard of review applied to tardy claims like this one, we have no difficulty concluding that this constitutional requirement was met. Count Two clearly indicated that the money laundering transaction involved the sale of the vehicles for cash and recited the relevant statutory provision. Reference to that statutory provision quickly would have disclosed that the term "financial transaction" is defined to require a nexus with interstate commerce.
 
 B
 
 13
 In addition to his claim with respect to the indictment, Bell points with considerable confusion to a number of allegedly fatal defects in the district court's jury instructions, mostly pertaining to Count Two. Because Bell failed to object to the instructions at trial, we review all these challenges, so far as we can understand them, in light of the entire charge and solely for plain error. Singer v. United States, 380 U.S. 24, 38 (1965); Fed. R. Crim. P. 52(b).
 
 
 14
 First, Bell argues that Congress implemented a heightened but unspecified intent standard when it enacted 18 U.S.C. Sec. 1956(a)(3)(C), a standard which the district court failed to incorporate into its jury instructions with respect to Count Two. Section 1956(a)(3)(C) makes it a crime for one
 
 
 15
 with the intent to avoid a transaction reporting requirement under State or Federal law, conduct[ ] or attempt[ ] to conduct a financial transaction involving property represented to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity.
 
 
 16
 With respect to the intent elements of the crime just detailed, the district court charged the jury that to convict Bell the government must prove beyond a reasonable doubt
 
 
 17
 [f]irst, that the defendant knowingly conducted or attempted to conduct a financial transaction; second, the financial transaction or attempted financial transaction involved property represented by a law enforcement officer to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity; and third, that the defendant engaged in the financial transaction with the intent to avoid a transaction reporting requirement under federal law.
 
 
 18
 We are at a loss to see what more by way of intent might be required by the statute, and Bell does not tell us, so we must reject his first claim.
 
 
 19
 Second, Bell notes that the instruction quoted above concerning the type of property involved in the laundering offense (the second element just recounted) theoretically permitted the jury to convict if the property was either (1) "represented by a law enforcement officer to be the proceeds of specified unlawful activity," or (2) "used to conduct or facilitate specified unlawful activity." The statutory language quoted above criminalizes both, but Count Two of Bell's indictment unsurprisingly charged only the former, since the"drug money" used by the law enforcement officials in setting up the second transaction with Bell actually was used to apprehend Bell and not to conduct or facilitate specified unlawful activity. While this overly broad instruction was technically in error, Bell has failed to make the required showing of prejudice under the applicable plain error standard of review, see United States v. Olano, 113 S. Ct. 1770, 1777-78 (1993), because the jury cannot reasonably be thought to have convicted Bell on a theory unsupported by any evidence at trial when a contrary, plausible theory was amply supported by that same evidence.
 
 
 20
 Third, Bell cites as error an irrelevant instruction telling the jury that it could infer proof that the defendant "knew the purpose of the financial transaction, or attempted financial transaction, was to conceal or disguise the nature, location, source, ownership or control of the proceeds of specified unlawful activity" from proof of the fact that "a law enforcement officer represented that the property involved in the financial transaction, or attempted financial transaction, was the proceeds of specified unlawful activity." Proof of the matter in question was irrelevant to the crimes charged.[4] Again, however, Bell has failed to make the required showing of prejudice, see id., because the jury was never instructed that it could convict Bell if he in fact knew that the transaction was for the above-mentioned purpose.
 
 
 21
 Finally, Bell objects to three intent instructions, one applicable to both crimes and two applicable solely to the money laundering charge. He first objects to the district court's instruction that both crimes charged were specific intent crimes, contending that the crime charged in Count One was not. This is incorrect: both crimes, the transaction structuring alleged in Count One and the money laundering charged in Count Two, required proof of an intent to avoid transaction reporting laws and were therefore specific intent crimes. Next, Bell argues that the district court erred in instructing the jury that it could infer the necessary mens rea for the money laundering crime from the fact that the law enforcement officer had represented the funds to be proceeds from specified unlawful activity and that Bell's subsequent actions indicated that he believed those representations. This was not error; such an instruction was entirely proper. Finally, Bell objects to the district court's instruction that it generally isn't necessary to show that the defendant knew he was violating the law, except where the crime requires proof of a specific intent. This instruction, too, was entirely proper. In summary, these three instructions were proper and Bell's objection to them unfounded.
 
 C
 
 22
 With respect to his sentencing, Bell challenges (1) the district court's determination that his conduct warranted a two-level upward adjustment for his role as an "organizer or leader" of the criminal activity and (2) its decision to exclude certain lay opinion testimony at his sentencing hearing.
 
 
 23
 * Bell argues that the district court erred in finding him an "organizer or leader" under Sec. 3B1.1 of the Sentencing Guidelines because the scheme had only two participants, Earehart and himself, and he was Earehart's follower, not the leader of the operation. Role adjustments are factfindings we review solely for clear error. See United States v. White, 875 F.2d 427, 431 (4th Cir. 1989).
 
 
 24
 The district court's conclusion that Bell's conduct warranted an enhancement pursuant to U.S.S.G. Sec. 3B1.1(c) wasn't clearly erroneous. Section 3B1.1(c) enhances the sentencing level of "organizer[s], leader[s], manager[s], [and] supervisor[s]" of criminal activity involving fewer than five participants, and the commentary accompanying it directs the court to consider, in determining whether an enhancement is proper,
 
 
 25
 the exercise of decision making authority, the nature of participation in the commission of the offense, ... the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.
 
 
 26
 Sec. 3B1.1, comment (n.3). Viewing the evidence in this case in light of those criteria, we believe it supports the district court's finding. Although Earehart was apparently Bell's superior in their legitimate calling, the automobile dealership, the evidence adduced at trial suggested that Bell masterminded their criminal activity. Videotapes introduced into evidence at trial demonstrated rather vividly the dominant role Bell assumed in negotiating the second transaction with the undercover agents. Bell was the one who acted as if he were running the affair, Bell was the one who claimed to have designed the scheme, Bell was the one who knew how to avoid the reporting requirements, and Bell was the one who explained the plan to the agents; Earehart sat in a corner and made meaningless conversation. Moreover, other evidence suggested that Earehart may have lacked the know-how to run a complex money laundering scheme: he didn't know how to use a calculator, for instance, and he executed no paperwork when he closed legitimate automobile sales at the dealership. The district court's conclusion that "this money laundering scheme would not have been completed without the able assistance, management, and leadership of Mr. Bell" was supported by the evidence.
 
 2
 
 27
 At sentencing, the district court excluded certain testimony of Steve Steen, one of Bell's former employers. More specifically, it forbade him to give an opinion as to whether Bell's conduct in this case was an aberration. Bell contends that this evidentiary exclusion was a reversible abuse of discretion.
 
 
 28
 We disagree, and conclude that the district court did not abuse its discretion here. A defendant may be entitled to downward departure if his conduct constitutes a "single act[ ] of aberrant behavior," U.S.S.G. Sec. 1A4(d), p.s.; United States v. Glick, 946 F.2d 335, 338 (4th Cir. 1991), and Bell argued for such a departure in his case. Steen's testimony was part of that effort, and the district court permitted him to testify that during his association with Bell, Steen never saw Bell do anything dishonest. It did not, however, permit him to give his opinion whether the misconduct to which various witnesses testified at trial was an aberration, because it concluded that Steen wasn't qualified to give such an opinion and that his knowledge of Bell's present behavior was too attenuated because his working relationship with Bell had terminated three years before the charged offenses took place. Even were we to assume that the"aberrant behavior" determination is one on which lay opinion is helpful to the trier of fact, see Fed. R. Evid. 701,[5] Steen's lack of a recent working relationship with Bell precluded any knowledge on his part of whether Bell's crimes were a "single act[ ] of aberrant behavior" or part of a recent pattern of activity. We therefore conclude that the district court properly excluded the testimony in question.
 
 III
 
 29
 For the foregoing reasons, the district court's judgments of conviction entered against Bell and the sentence it imposed on him are each
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 Count Two charged Bell with knowingly and willfully conduct[ing] and attempt[ing] to conduct a financial transaction (the purchase and sale of motor vehicles), involving property (money) represented by a law enforcement officer to be the proceeds of specified unlawful activity (the distribution of cocaine, a Schedule II controlled substance), with the intent to avoid transaction reporting requirements under Federal law; in violation of Title 18, United States Code, Sections 1956(a)(3)(C) and 2
 
 
 [2]
 This is not, as the government suggests, tantamount to a requirement that "all the definitional language contained within the statute" be included in the indictment. Only when a purported definition includes an articulable fact which must be proven beyond a reasonable doubt but which isn't obvious from the statute's recitation of the words defined would that fact be an independent essential element. That's certainly the case here, however, because the requirement that the transaction involve "interstate commerce" is in no way obvious from the mere recitation of the words "financial transaction" in the "offense creation" subsection of the statute
 
 
 [3]
 The relevant questioning proceeded as follows:
 United States. None of [the automobiles involved in the money laundering transaction] was manufactured in West Virginia, was it?
 Bell. I'm not sure.
 United States. They all had to travel in interstate commerce to get to the dealership there at Oak Hill; right?
 Bell. Well, as far as manufactured in West Virginia, they weren't, but as far as in our possession, I can't say, because sometimes we do a dealer trade with another dealer-
 United States. No-
 Bell.-and if we would do that, but as far as manufactured, they would not be.
 United States. Right. So none of them were manufactured in West Virginia.
 Bell. Not to my knowledge.
 
 
 [4]
 Proof of intent to conceal or disguise is necessary for conviction under Sec. 1956(a)(3)(B), a companion provision to Sec. 1956(a)(3)(C). Bell wasn't charged with a violation of Sec. 1956(a)(3)(B)
 
 
 [5]
 Strictly speaking, the Federal Rules of Evidence don't govern the district court's factfinding at sentencing, U.S.S.G.Sec. 6A1.3(a), but they certainly provide thoughtful guidance to the court concerning the relevance and reliability of the information offered for its consideration